Thank you, Your Honor. My name is Ron Perry. I'll be presenting the argument for the appellant. My co-counsel is Matthew Sharp. I'd like to reserve three minutes for rebuttal. OK. This is what we've got to left on the clock. We're 48 minutes to rebuttal. Go ahead. This is an appeal from a summary judgment entered by the District Court in Reno, Nevada. Everybody agrees that the standard of review is de novo. If I was to try to succinctly state the issue that's before the court today, I would say it is as follows. When a life insurance company elects to retain and invest a death benefit, is that either the legal or factual equivalent of a person electing to make a deposit into a bank account? Wasn't it your client who elected to leave her money there? No, Your Honor. It was MetLife. When they came up with this money market program, they rewrote their policies to give themselves two options to pay the death benefit. They could pay it in one sum, which is by check, as they've done for probably centuries, or they could place it in an account that earns interest. And so it was MetLife's choice to place this money in an account that earns interest. But your client could have written a check for the full amount of that account as soon as she got it and taken it, right? That's true. All right. What harm did your client suffer in this case? Our client suffered the loss of earnings on her money. What this case is about is a margin. When MetLife retains these death benefits, they've constructed this program so that they pay a money market rate of interest. They take the money, however, and invest it in their general investment account, which historically has earned two to three points more than a money market rate of interest. So the question is, who owns that margin? Who owns that two or three points that is generated when MetLife retains the death benefits? The customer agreement, which is the contract that they prepare. Now, keep in mind, the policy simply says we can place the money in an account that earns interest. That's all it says. It gives no terms and conditions of the account. They then send a customer agreement, which provides the terms and conditions of the account. One of the things that the customer agreement says is that we guarantee the principal and all interest earned. So after the policy says we place it in an account that earns interest, they then say we guarantee all the interest earned. The customer agreement also guarantees a minimum rate of interest, and that's MetLife's position is that their only obligation is to pay the minimum rate of interest. So in this case, they paid more than that, and the account documents also state exactly how they will compute the interest that the beneficiary earns. The customer agreement has a guaranteed minimum in it, and it states how that will be calculated. It will never be below 3 percent. There's no question about that. But the issue then is what happens to the money over and above that, and that gets into the issue of whether or not this is considered to be a bank account. The court applied law not having – there is no agreement. There is no document that addresses the margin, the additional money. There is no document that says Ms. Clark gets that. There is no document that says MetLife gets that. So the court applied bank deposit law and said that applying that, the way a bank account works is that the bank is deemed to be the owner of the deposit if a deposit is made, and the depositor is deemed to be a creditor, so it's a debtor-creditor relationship. And so the court, applying bank deposit law, deemed that MetLife owned the money after it was placed in the interest-bearing account, and as the owner of the money, it was free to keep the excess on it. Now, Ms. Clark also stated a claim, in addition to breach of contract, for breach of fiduciary duty, and the court used, again, bank deposit law to defeat that claim and grant summary judgment on that claim. What the court said about Ms. Clark's breach of fiduciary duty claim was that there was no insured and insurer relationship, which under Nevada law creates fiduciary duties. The court said there was no insured and insurer relationship because there was a debtor and creditor relationship, as in the case of a bank deposit. So, you see, using the bank deposit theory, the court essentially said when that death benefit is placed into the interest-bearing account, Ms. Clark loses it. It's no longer her money. MetLife becomes the owner of that money, and it's a debtor-creditor relationship. So both of the causes of action were dismissed using the bank account theory. Now — And what's wrong with that? Well, I mean, she's not insured, right? She's a beneficiary. She's a beneficiary. Okay. As you could have elected to take the money out. Yes, sir. So why isn't this just like placing it in a bank account? Well, a couple reasons. One is there was testimony from a MetLife executive who said specifically this is not a bank account. It is not a money market account. It is an insurance product. He had to say that because MetLife is not regulated as a bank. They're regulated as an insurance company. So he specifically said that this is not a bank account. Also — But so what? So if you don't use the bank account theory, then Ms. Clark is the owner of the death benefit, as she was when it was paid. MetLife's theory is that somehow it owes a death benefit under the policy, and then it pays the death benefit. Let me just tell you. The client was a beneficiary. She got the sum. It was placed in his account. She could write a check for the entire sum or any part of it as soon as she wanted to. In fact, she did. She spent most of the money very quickly, right? It's — most of it is gone. Fairly quickly, yeah. Well, anyway, she did. She was never denied access to the money. All right?  Are you with me?  Okay. And she was given interest in excess of three percent, whereas had she taken it out and put it in a bank, she would have gotten substantially less than that. So I'm not quite sure what her beef is. Well, her beef is that MetLife kept her money, yet didn't disclose to her that it was profiting on her money. But if MetLife had lost money, let's say, on bad investments — because don't forget, the account itself says it's going to be paid from the general corporate assets. So if MetLife had taken the money that it had deposited in these accounts and invested it in real estate or mortgages or something like that and lost it, they still would have had to pay as stated in this, and they may have ended up paying more money to her than they actually made on their investment portfolio. So it seems to me that it could go either way, but she's guaranteed at least the three percent, and she knew that right up front. And like I think we've both been saying, if she didn't like it, she could have just taken it out. But I don't — Your Honor, I don't think that — first of all, I'm not familiar with all the documents word for word in this case. I don't think there was ever any disclosure that the money was placed in MetLife's general investment account. Well, I'm reading from the district court opinion, which quotes that, and it says it pays it from its general corporate assets. So if that's a misquote from the documents, then maybe you could look at the record and correct me on that. But that's never been contested by you or anybody else, as far as I know. Your Honor, that's specifically — In fact, that's your whole point, that they're putting it in their general fund and making more money than they're paying her. Right. But that was not disclosed. That's my point. It was not in the customer grant. Is my time up? You don't see the clock? It says six minutes. Is that what I have left? Okay. That's why the number keeps changing. It never goes up. Trust me, it always goes down. It's a way of life. So getting back to your question about the customer agreement, you know, the district court said that the customer agreement was inherently deceptive because it refers to this account as a money market account. And indeed, it's not a money market account. And our view is MetLife's whole game plan here was to make this appear as if it's a money market account so that people who got death benefits would be encouraged to leave their money in there rather than taking the money and putting it into a true money market account. Would they have gotten less interest? Not necessarily. I mean, they were paying a competitive money market rate of interest, but it wasn't a money market. It's a guarantee. Does it matter? That is certainly a term of the document, that there is a guaranteed minimum, but that doesn't account for the excess money that's being earned on those funds, which gets us back to the question of who owns those funds. And that's where we say the bank deposit analogy fails. One of the primary cases relied upon by MetLife and cited by the court, I think, and the ---- I'm just so baffled by the claim maker by having a client. You basically said she's entitled to a 3% guarantee in return, but she's also entitled to everything the bank made on this. So they lose money, they have to pay 3%. If they make money, then the money belongs to your client and everybody in the same class. I mean, you know, somebody could very quickly go out of business doing business on that basis. You know, if it goes up, I give you all the money, and if it goes down, I still give you a minimum of 3%. I mean, how do you run a business that way? Well, I don't think MetLife's general investment account has ever gone down. That's the whole idea of this program, is that they can pay money market rates of interest. You know, people have lost fortunes on the theory that, oh, this has never gone down. Remember, people used to invest in IBM and General Motors and, you know. Oh, so if MetLife wasn't. Remember, you must be, if I look at you, you must remember when investment in U.S. Steel was considered to be a, you know, very solid investment, or in Ford Motor Company. All right. Well, not so much anymore. So there's nothing that doesn't come down. Right. And that's true. And so that if MetLife would happen to lose all of their money, then Ms. Clark's money, the guaranteed 3%, would be no good. It wasn't really a guarantee. It was just a commitment to pay. So one of the principal cases that MetLife relies on to get to this bank deposit theory is the case of the Second Circuit called Westchester Savings. And that case makes it clear that this bank deposit theory is peculiar to the banking industry, the theory that when money is deposited into an account, that the holder of the money then becomes the owner of it, and the depositor becomes merely a creditor. That's a theory that exists only in the banking industry. And so the case says it's peculiar to the banking industry. And, again, the bank deposit theory is what the court used, the district court used, to make the determination that Ms. Clark's funds actually became the funds of MetLife. No, I want to point out here, in two and a half minutes, if you wanted to leave time for a bottle. Thank you, Your Honor. Okay. We'll hear from the opposing counsel. Thank you, Your Honor. Philip Sano, representing Defendant Aperle, Metropolitan Life Insurance Company, which I may sometime refer to in my argument as Met or MetLife. Plaintiff is flatly wrong when he asserts or when Plaintiff's counsel asserts that MetLife set up this account and chose to set the account. Plaintiff, when she signed her claim form, had an option of receiving a single-sum check, or she did not check the box for the single-sum check, MetLife reserved the right to issue this total control account, this checking account that's at issue here. Plaintiff did not check the box. She had the ability at the get-go to choose between this account and getting a check. Yes, Your Honor. She had complete control from the get-go, and she had it multiple times to access her money if she wanted it. She had it with the receipt of the claim form, with the claim's instructions, which she admitted in her deposition she never read. Her mother-in-law, I'm sorry, her stepmother filled out the claim form for her. Plaintiff came into her stepmother's office, signed the claim form without reading it, sent it in to MetLife. All MetLife knows is here we have a claim form where the claimant did not check the box for the single-sum check, and therefore MetLife, according to the claim form, had the option of issuing the total control account or the checking account. MetLife issued the checking account, sent her a cover letter enclosing the checkbook, and in the cover letter it again said you can write one check for all of your monies should you wish it. So knowing that some people don't always read their claim forms or their insurance materials, she had multiple opportunities to access her monies completely and from the get-go, as you say. Now, the account stayed open for 13 months. Plaintiff wrote approximately 40 checks, and it was a checkbook. Plaintiff is a 28-year-old something who certainly understands how to use a checkbook. If for any reason she wanted her monies, she would have written a check for the full amount. I mean, this is common sense. So for a plaintiff to argue that she somehow did not have access to her money or that she did not set up this account that MetLife did, the record doesn't support it, nor does common sense. Plaintiff, excuse me, MetLife should prevail in this case for very compelling reasons. MetLife met all of its contractual obligations, and the only contracted issue is the customer agreement on page 33 and 34. It's a two-page simple agreement in a question-and-answer format. MetLife met every obligation under that customer agreement. Plaintiff received all the benefits promised under the customer agreement. Plaintiff suffered no damages. In fact, plaintiff came out smelling like a rose, if you don't mind me saying that, because she did very well on this checking account. If she had her checking account open today, she would be earning a minimum of 3 percent interest. There's no checking account in the country with a balance of $50,000 or less, because that's what she started out with. There's no checking account in the country paying that amount of interest. Plaintiff claims that she was entitled to a money market account. As the record indicates, during the time that plaintiff had her account open, from August of 2006 to September of 2007, MetLife credited, again, a 3 percent minimum interest rate, but MetLife actually paid 3.8 to 4.2 percent interest. Money market accounts during that time, and this is undisputed, this entire record is undisputed, money market accounts during that time were paying between .78 and I believe .96 percent interest, less than 1 percent. If plaintiff had received a money market account like she claimed she was entitled to, she would have received about one-third to one-fourth to one-fifth of the interest MetLife credited. Can I ask you a question? Sure. The district court at footnote two states that the agreement represents a MetLife liability which it pays from its general corporate assets as checks are written on the account. Where in the materials that the plaintiff received does it say that? It says in the question. I've read the TCA agreement over and over again. I can't find that. But the district court obviously, he doesn't cite to anything in the record when he found that. But there must have been something to lead him to that conclusion. Your Honor, that's a correct conclusion, first of all. And secondly, there was testimony by John D'Onofrio, who was the MetLife representative, that the where the monies were. The monies were, as with any checking account or any CD or any other financial instrument that you have, the monies are not in the account as if it was a lockbox or safety deposit box. The money is out somewhere being invested to earn enough investment return to pay the promised interest rate that's promised in the agreement. I mean, that's common sense. And plaintiff implicitly understands that when they claim that they're entitled to all the interest earned on the account, all the investment returns on the account. They claim that that was what the customer agreement promised it didn't. But by making the claim, you have to assume that in order to receive all investment earnings, the money must be out there invested somewhere. So I'm sorry, I did not answer your question, Your Honor. The customer agreement on the first page, and I think it's page 33 of the EOR, the excerpt of record, states that MetLife guarantees or backs the account with its fully backs the account. No, I understand that. It's a question of whether the agreement itself actually said that these monies are going to be paid from their general corporate assets. But as you're saying, they have to assume that in order to make this claim at all. Well, I think they have to, Your Honor. And it doesn't matter whether the account says that or, excuse me, whether the customer agreement says that or not. The customer agreement was the contract between MetLife and the plaintiff. Plaintiff reads into the customer agreement provisions that aren't there. For example, plaintiff reads into the customer agreement the fact that she was promised a money market account. Plaintiff reads into the customer agreement the fact that she was promised all investment earnings. Those provisions simply do not exist in the customer agreement. We're refuting a negative. With regard to all investment earnings, the plaintiff ignores in their argument and briefing below, in their brief before this court, and we point this out to them in our reply brief, and in their final brief, they never address it. Plaintiff ignores the key provision of this two-page customer agreement, which states what rate of interest will I earn? And what they focus in on is a provision of the customer agreement that says MetLife fully guarantees, quote, all the interest you will earn, or you earn. And they focus on the word all by saying all the interest means all the investment return on the monies. Interest is not investment return, first of all. And so that's one qualification they miss. And the second qualification in that phrase, all the interest you earn, it's not all the investment return Met earns. It's all the interest you earn. So the question is, well, what rate of interest will I earn? The very next provision in the customer agreement, in bold letters, and again, it's in a Q&A format, the very next provision reads, what rate of interest will I earn? And it explains what you'll earn, and they never address it. And what that provision says is that, again, we've talked about some of the provisions here. MetLife will guarantee 3% minimum. MetLife will set their interest rate weekly. Now, that provision is important because for MetLife to use terminology like that, they can't be promising all investment returns. And common sense tells you they wouldn't promise all investment returns anyway. MetLife would always lose money because if they turned over everything they earned, then they would have the cost and the investment risk of earning the money. No one assumes that when their money is invested in a checking account, that the interest rate they get or that they're credited is the actual amount earned. No one assumes that. No one takes that position. And there's no duty to disclose that MetLife will earn and keep the spread. There's no duty with regard to money market accounts, which is what she claimed she should have had. If she had had a money market account, she would have earned less interest, and she would not have had that disclosure that where the money was, they were keeping the spread. Common sense tells you that the financial institution has to earn a spread in order to stay in business and pay everybody from the employees to the overhead to the guy who waters the plants. That's common sense. And Judge Hicks, the district judge, stated that in his opinion. And so the fact that plans make much ado about the fact that it's not stated in the customer agreement that MetLife is going to keep the spread, that's not required. That's not a breach of a contract. It's simply something that wasn't addressed in the contract. It doesn't mean that MetLife failed to disclose it. It just means that it wasn't an issue. It wasn't a promise. It wasn't a commitment. The question before the court is did we promise, did we keep to the provisions, and did we honor the provisions of the contract? And what would I have liked to have seen in there if I had had a chance to draft it? And turning to the contract, the customer agreement, every provision in there that MetLife was required to do something. I think we got the point, Mr. Sanner. I'm sorry? I think we got the point. Okay. I will move on, Your Honor. Tell me, Mr. Sanner, is Mr. Gregory still a partner at Sutherland Aspen? Mr. Gregory. Is he still a partner? Is he still a partner at Sutherland Aspen in Washington? Would that be a good thing or a bad thing, Your Honor? Well, he had a case with me in the claims court 25 years ago, and I remember him fondly. Then he's an integral part of the case. Well, would you give him my best regards? I have not seen him in the 25 years since then. I will do that, Your Honor. How about Mr. Schroer? I'm sorry? Mr. Randy Schroer? I did not catch the name. I apologize. Schroer. T-H-R-O-W-E-R. T-H-R-O-W-E-R. Well, give him my best. I will do that, Your Honor. I remember him very fondly. Schroer. This is not related to this case, but I just brought back memories of 25 years back. Good memories, I hope, Your Honor. They were very good memories. I got the verse, but it was all right. Your Honor, the plaintiff also argues there was no account ever set up. I think we get the point. All right. The plaintiff also argues that the breach, that the special and confidential relationship was in existence and was breached by Medline. I think if we had questions on that score, you would have heard them. I'm sorry, Your Honor? I think if we had questions on that score, you would have heard them. Yes, Your Honor. And I think the last argument was plaintiff argued that there was a breach of fiduciary duty. If I may point out, Your Honor, that they argued breach of fiduciary duty based on the insured-insured relationship. In this case, Your Honor, excuse me, there is no claim under the policy. First of all, the plaintiff was not an insured. She was a beneficiary under the policy. Point number one. I think we got that one, too. Thank you, Your Honor. Thank you, Mr. Tanner. We'll hear from the rebuttal. We'll hear the rebuttal argument. Thank you, Your Honor. Thank you. Mr. Perry, I think we understand your point. I think you're concerned not about a breach of the agreement. You're concerned with something that you think she didn't understand, and that is she thought the 3 percent or whatever it was is all the money that her investment would earn. She found out later it earned more, and she wants what it earned. Isn't that pretty much it? Yeah. We believe that MetLife had an obligation to disclose to her, since it was her money, how they were going to invest it, the margin that they were going to keep. What's the basis of the obligation? Well, one of the bases is the customer agreement and the policy read together. Yeah, but that wasn't breached. And the other is the fiduciary relationship. The customer agreement wasn't breached, was it? Well, that's a question. The fact that they're going to keep the margin is not, I'll admit, it's not addressed whatsoever in the customer agreement. That's why you hear Mr. Stano say, well, everybody understands that. Well, maybe they understand it, maybe they don't, but it's not in the customer agreement. No, but on her theory, if it goes up over the 3 percent, I get it. If it goes down, I still get it. Well, they have a right to change the 3 percent, too. I said that's understood because in that situation, you couldn't be in business. That's his argument. Keep in mind, the customer agreement is not negotiated. It's something MetLife sends out. They can change the customer agreement. And if she didn't like it, she had an option, and that was to write all of the money right out of that account on her first check. Right. Didn't she have that option? Yes, she did. Yes, she did, Your Honor, which I don't think is a defense for a contract. I didn't want to waste all of your time. But those are the pivotal questions that we're going to have to decide on. One further point I'd like to make is the fiduciary relationship claim. Under Nevada law, which we're talking about here, there's clearly a fiduciary relationship that exists between an insurer and insurer just by the nature of the relationship. Now, the only way the court got around that was to use the bank account theory and say what's not insured and insurer, it's debtor and creditor. So I'd like you to consider that. If the bank account theory is rejected, then they are insurer and insurer. And it's clear that a third-party beneficiary, a debt beneficiary, has rights under an insurance policy. Mr. Stano says she's not the insurer, she's not the deceased person, which, of course, is true. But she's a beneficiary. The next point I'd like to make is that the Supreme Court, even in the Pegram case that we cited, recognized the concept of a common law trustee. When one entrusts money to another and the other has full discretion as to how it's invested, that creates a fiduciary relationship. When you go into your stockbroker to open an account, you can check discretionary or nondiscretionary. If you give your stockbroker discretion, he or she becomes a fiduciary at that point. So I'd like you to consider the ---- But if I leave money in a money market account with my stockbroker and they pay me a certain amount of interest on that money market account, do I have any right to think that they're not making more money than they're paying me, which isn't very much? You know what, if you went into a true money market, and, again, Mrs. Clark doesn't allege that she should have gotten a money market. She alleges that they used the money market as a smoke screen to hide the fact that the money was really in another type of investment. But if you had a true money market, you would have disclosures to you as to exactly how they were investing the money and exactly how much they were charging you for expenses in it. Thank you. Thank you. Cases are able to stand submitted. We are adjourned. After conference, we will return if there are students who wish to ask questions. This will be a wrap. All rise.
judges: Gettleman, Kozinski, Farris